UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| POTOMAC RIVERKEEPER, INC., <br> 3070 M Street NW <br> WASHINGTON, DC 20007, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF ALEXANDRIA, VIRGINIA, <br><br> Defendant. | Civil No. __1:22-cv-506__ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |

## I.  INTRODUCTION

1. This action is a citizen suit brought under section 505 of the Clean Water Act ("CWA") and section 7002 of the Resource Conservation and Recovery Act ("RCRA") as amended. 33 U.S.C. § 1365; 42 U.S.C. § 6972.  Plaintiff Potomac Riverkeeper, Inc. ("Plaintiff" or "Potomac Riverkeeper") seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs and attorney's fees for the City of Alexandria's ("Defendant" or the "City") repeated and ongoing violations of sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, by unlawfully discharging pollutants from a point source, a stormwater outfall located at the eastern end of Oronoco Street in Alexandria, Virginia (the "Outfall"), into the Potomac River, a water of the United States, without a permit and for the generation and disposal of solid waste contributing to an imminent and substantial endangerment to human health and the environment in violation of Section 7002(a)(1)(B) of the RCRA, 42 U.S.C. § 6972(a)(1)(B).

## II. JURISDICTION AND VENUE

2. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 33 U.S.C. § 1365(a) (CWA jurisdiction), and 42 U.S.C. § 6872(a) (RCRA jurisdiction). The relief requested is authorized pursuant to 33 U.S.C. §§ 1319(d) and 1365(a), 42 U.S.C. § 6972(a), and 28 U.S.C. §§ 2201 and 2202.

3. Pursuant to section 501(b)(1)(A) of the CWA, 33 U.S.C. §1365(b)(1)(A), and section 7002(c) of RCRA, 42 U.S.C. § 6972(c), on March 13, 2019, Potomac Riverkeeper notified the Defendant of its intent to file suit against the Defendant for its violations of the CWA and the RCRA ("Notice Letter"). Potomac Riverkeeper served this notice on Justin Wilson, the Mayor of the City, and Joanna Anderson, the Deputy City Attorney for the City. Potomac Riverkeeper also provided such notice to Andrew Wheeler, then Acting Administrator of the U.S. Environmental Protection Agency ("EPA"); Cosmo Servidio, then Region III Administrator for the U.S. EPA Region 3; Yon Lambert, AICP, Director, Department of Transportation & Environmental Services of the City of Alexandria; and David K. Paylor, Director, Virginia Department of Environmental Quality ("VDEQ"). A copy of the Notice Letter is attached as Exhibit A.

4. More than sixty days have passed since the Notice Letter was served and neither EPA nor the Commonwealth of Virginia has commenced and diligently prosecuted a civil or criminal action in a court to require Defendant's compliance with the CWA and the RCRA. The CWA and the RCRA violations identified in the Notice Letter are of a continuing nature, are ongoing, or are reasonably likely to re-occur. Defendant thus remains in violation of the CWA and the RCRA.

5.      Venue in this District is proper pursuant to 33 U.S.C. §§ 1365(c)(1), 1391 and 42 U.S.C. § 6972(a), because Defendant is located in this District, the CWA violations originated in this District, and the RCRA disposal of solid waste and resulting imminent and substantial endangerment originated in this District.

### III.     PARTIES

6.      Plaintiff Potomac Riverkeeper is a nonprofit, membership-based environmental advocacy organization founded in 2000 for the purpose of ensuring stronger enforcement of federal, state, and local clean water protections in the Potomac River.  Since 2015, Potomac Riverkeeper has been a member of the Potomac Riverkeeper Network, an organization with more than 2,000 members that includes three Riverkeepers, one each for the Upper Potomac and Lower Potomac (where the Outfall is located), and a third for the Shenandoah River.  Potomac Riverkeeper and its members work to protect and restore the water quality of the Potomac River and its tributaries, which is critical to the almost six million people whose drinking water comes from that river, as well as those who use the River and its tributaries for recreation.  Potomac Riverkeeper's office is located at 3070 M Street NW, Washington, DC 20007.

7.      Defendant City of Alexandria is a municipality organized and existing pursuant to Title 15.2 of the Code of Virginia.

8.      At all relevant times, Potomac Riverkeeper and the City are and were "persons" as that term is defined by the CWA, 33 U.S.C. § 1362(5), and by the RCRA, 42 U.S.C. § 6903(15).

### IV.     BACKGROUND ON THE POTOMAC RIVER

9.      The Potomac River (the "River"), a navigable water of the United States, originates at the Fairfax Stone in West Virginia and forms the boundaries of Virginia, Maryland,

and the District of Columbia before entering into the Chesapeake Bay.  The River is an important waterway for public drinking water, for recreational use by people who travel in interstate commerce, and for its support of recreational fishing.

## V.     STANDING

10. To achieve its goals, Potomac Riverkeeper implements educational programs, river cleanups, a volunteer water quality monitoring program, environmental initiatives, recreational activities, and environmental law enforcement efforts throughout the Potomac River watershed.  Potomac Riverkeeper's work has helped communities in Maryland, Pennsylvania, Virginia, West Virginia, and the District of Columbia.  Its successes range from compelling a Virginia sewage treatment plant to reduce its annual nutrient pollution by 60,000 pounds to co-authoring a U.S. Geological Survey report on intersex fish and fish kills.

11. Potomac Riverkeeper's members include individuals concerned about the protection and restoration of the Potomac River, its tributaries, habitats, and resources, who are dedicated to preserving and improving the cultural, historic and environmental resources of the Potomac River.  Potomac Riverkeeper's members fish, kayak, bird, walk and participate in other recreational activities throughout the Potomac River watershed, including in the area of the Outfall, and drink water from the Potomac River.

12. Potomac Riverkeeper's members use, enjoyment, and appreciation of the River has been and will be harmed, reduced, and degraded by the ongoing discharges from the Outfall and the resulting environmental impacts.

## VI.     LEGAL BACKGROUND

13. Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the nation's waters."  33 U.S.C. § 1251(a).  The

CWA further declared that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1).

14. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States, except in compliance with the terms of a National Pollutant Discharge Elimination System ("NPDES") permit, issued by the EPA or an authorized State pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342.

15. The NPDES permit program in Virginia is administered by the Virginia Department of Environmental Quality ("VDEQ") pursuant to EPA authorization under Section 402(b) of the CWA.

16. "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

17. "Navigable waters" is defined as "waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7), where "waters of the United States" is defined to include "[t]he territorial seas, and waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide. . . ." 40 C.F.R. § 120.2(1).

18. "Pollutant" includes a wide range of items, such as "solid waste, . . . sewage, garbage, sewage sludge . . . chemical wastes, biological materials . . . [and] industrial waste." 33 U.S.C. § 1362(6).

19. "Point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, or channel . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

20. The CWA allows citizens to bring an enforcement action in federal district court against any "person," defined to include any State, municipality, commission, or political subdivision of a State, or any interstate body (33 U.S.C. § 1362(5)), committing an ongoing violation of the CWA, so long as the citizen provides sixty days of notice of any alleged violations prior to commencing suit. *See* 33 U.S.C. § 1365(a)-(b).

21. The Resource Conservation and Recovery Act ("RCRA") regulates the storage, transportation, treatment, and disposal of solid and hazardous wastes.

22. A "solid waste" is defined as any "garbage, refuse, . . . and other discarded material, including solid, liquid, semisolid, or contained gaseous material from industrial, commercial, mining, and agricultural operations. . . . ." 42 U.S.C. § 6903(27).

23. RCRA allows "any person" to file suit against any other person, defined to include "the United States and any other governmental instrumentality or agency," who was or is a "past or present generator . . . who has contributed or who is contributing to the . . . present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

24. To file suit against a defendant whose conduct contributes to an "imminent and substantial endangerment" pursuant to this section, a citizen plaintiff does not have to demonstrate that the defendant's actions violated RCRA's Subtitle C or D regulatory programs. Instead, one filing suit under RCRA's imminent and substantial endangerment provision need only show that the defendant's past or ongoing disposal of solid waste is contributing to conditions that may present an imminent or substantial endangerment to human health or the environment.

25. "Waste may present an imminent and substantial endangerment to health or to the environment if the danger of harm is immediate" though "the threat's impact need not be felt until later, since the statute specifically considers waste that *may* present endangerment." *307 Campostella, LLC v. Mullane*, 143 F. Supp. 3d 407, 414 (E.D. Va. 2015) (citing *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485-86 (1996)).

26. Under RCRA's citizen suit provision, this court is authorized "to restrain any person who is contributing or has contributed" to an imminent and substantial endangerment and to "order such person to take any other such action that may be necessary" or both. 42 U.S.C. § 6972(a)(2).

## VII.   FACTS

27. In about 1851, the City built a manufactured gas plant ("MGP") at the corner of Oronoco Street and North Lee Street to produce natural gas from coal to be used by local residents and businesses for heat and light. The City owned and operated the MGP until 1930, when it sold its interest to the Alexandria Gas Company. The Alexandria Gas Company operated the plant for another sixteen years, eventually closing the plant in 1946. The plant was subsequently demolished, and various businesses used the remaining buildings until the site was redeveloped in the mid-1970s.

28. The MGP generated large volumes of coal tar and creosote wastes in connection with its production of coal-derived natural gas. These wastes accumulated in a large plume of chemicals under the MGP site, extending to the north under Oronoco Street.

29. In 1975, just prior to the redevelopment of the former MGP site, a 44 x 72-inch diameter storm water pipe was installed beneath the centerline of Oronoco Street adjacent to the former plant site. The pipeline extends past the northern edge of the former MGP site and runs

eastward to the River where it discharges via the Outfall into the River.  The Outfall is approximately five feet in diameter.  The area where the Outfall discharges into the River is bounded to the north by the Robinson Terminal North pier (the "Pier").  Coal tar and creosote wastes from the MGP site have continually entered the Outfall pipe and discharged into the River throughout the period of 1975 to the present, contaminating both the River and sediments near the Outfall and under the Pier.

30. The City installed absorption booms near the Outfall in 1979 at the request of the U.S. Coast Guard as well as a floating containment boom in 2000.  However, documents and visual observations demonstrate that those booms are poorly maintained and have failed to contain the contamination.

31. The City and the Outfall are currently subject to the VDEQ Phase II Municipal Separate Storm Sewer System Permit VAR040057 ("MS4 Permit") as provided in 9 VAC § 25-890-40.  This is a general Clean Water Act permit that authorizes the discharge of municipal stormwater, so long as the permit holder complies with all applicable regulations and permit terms.  However, the MS4 Permit expressly prohibits non-stormwater discharges from the storm sewer system unless they are authorized by a separate, individual Virginia Pollutant Discharge Elimination System ("VPDES") permit.  "Stormwater" is defined as "precipitation that is discharged across the land surface or through conveyances to one or more waterways and that may include stormwater runoff, snow melt runoff, and surface runoff and drainage."  9 VAC § 25-870-10.  There is no VPDES individual permit issued by VDEQ allowing non-stormwater materials to be discharged into the River at or in the vicinity of the Outfall.

32. The Outfall, is a "point source" within the meaning of the CWA from which coal tar and creosote wastes have been illegally discharged into the River in violation of CWA section

301(a) and the MS4 Permit.  33 U.S.C. § 1362(14) ("[t]he term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe [or] conduit . . . from which pollutants are or may be discharged.")

33. Coal tar and creosote wastes have also migrated through the soil and stormwater pipe bedding material and continue to seep up from the River sediments near the Outfall, which, in combination with the same types of materials discharging from the Outfall, has resulted in observable iridescent chemical sheens on the surface of the River, contamination of River sediments, and a noticeable odor of creosote.

34. Coal tar is a by-product of the process of using coal to produce natural gas. Creosote is a distillation product of coal tar.  Both coal tar and creosote contain polycyclic aromatic hydrocarbons ("PAHs"), a large group of organic chemicals, many of which are classified as probable human carcinogens.  PAHs belong to a group of persistent organic chemicals that do not dissolve in or easily mix with water.  Both coal tar and creosote are known as non-aqueous phase liquids ("NAPL").  They (and their constituent chemicals and degradation products) are "pollutants" within the meaning of the CWA, and both (and their constituent chemicals and degradation products) are "solid waste" within the meaning of RCRA when discarded.  Coal tar and creosote wastes are solid wastes under RCRA.  The City generated and has disposed of, and continues to dispose of, these solid wastes into the Potomac River.  The continued presence of these solid wastes in the surface water and sediments of the Potomac River presents an imminent and substantial endangerment to human health and the environment.

35. Humans can be exposed to coal tar and creosote compounds through inhaling its fumes, contact with the skin, or ingesting soil or water containing the compounds.  Once people are exposed to coal tar and creosote compounds, they can suffer adverse health effects, including

9

cancer, liver and kidney damage, irritation of the respiratory tract, or damage to the skin and corneas.

36.     Benthic and aquatic organisms can also be exposed to coal tar and creosote compounds that are in surface waters and sediments.  Exposure to these compounds can inhibit growth and prevent root growth in aquatic plants.  Invertebrates exposed to coal tar and creosote compounds can suffer from reduced shell deposition, decreased growth rates, impaired reproduction, and increased susceptibility to infectious disease.  Coal tar and creosote compounds in aquatic sediments can be toxic to invertebrates found in the area such as mollusks, crustaceans, insect larvae, and aquatic oligochaetes (earth worms).  In surface water and sediments, coal tar and creosote compounds can also be toxic to fish embryos, causing reduced hatching success, the development of skeletal and heart deformities, and other physical abnormalities.  Such adverse effects on aquatic organisms negatively impact the River's ecosystem and diminish the River's ability to support the recreational and other activities enjoyed by Potomac Riverkeeper members.

37.     PAHs are present in the soil and groundwater upgradient of the Outfall, the water that has discharged and that continues to discharge from the Outfall, and sediments in the River near the Outfall, including under and to the north of the Pier.  Documents prepared by or on behalf of the City indicate that PAH concentrations detected near the Outfall site are a potential danger to humans as well as to aquatic organisms and the animals that feed on them.

38.     In March 2000, the City applied to have the Outfall site entered into VDEQ's Voluntary Remediation Program ("VRP") to avoid a threatened enforcement action by the EPA.  The Outfall was accepted into the VRP in May 2000 and assigned VRP Site Number 00241.  A sediment investigation was conducted to determine the lateral and vertical extent of sediment

impacts from the Outfall site. A site characterization report produced in January 2001 estimated that the impact from the coal tar and creosote wastes associated with the Outfall extended approximately 750 feet along the shore of the River next to Founders Park to the south, approximately 500 feet to the north, and eastward for approximately 175 feet.

39. A follow-up sediment study conducted a decade later in June 2011 to provide a basis for developing a remedial strategy re-delineated the lateral and vertical extent of sediment impact. Several samples, including a sample taken to the north of the Pier, revealed total PAH (tPAH) concentrations in excess of the Probable Effect Concentration ("PEC") limit of 22.8 mg/kg established by MacDonald et al. 2000 that is recommended by the Wisconsin Department of Natural Resources and applied by VDEQ. A PEC is a consensus-based sediment quality guideline concentration above which harmful effects to benthic organisms are likely to be observed.

40. The City's 2013 revised Remedial Action Plan ("RAP") submitted to VDEQ recommended the removal of highly-impacted sediments having tPAH concentrations in excess of the PEC limit. Moreover, the revised RAP noted that the design and implementation of an effective remedy for impacted sediments requires the successful elimination of migrating coal tar residues feeding groundwater seeps within the Outfall area.

41. In 2016 and 2017, Potomac Riverkeeper took subsequent samples of discharges from the Outfall pipe as well as sediments near the Outfall, which confirmed ongoing PAH discharges in violation of the MS4 Permit and tPAH PEC exceedances in sediments.

42. In August 2017, the City submitted to VDEQ and received approval for a revised RAP designed to remove contaminated sediments from the Outfall area and to eliminate the visible sheens coming from the Outfall or in the area of the River to be remediated. To

accomplish that goal, the revised RAP established the following remedial approach: (i) dredging and removal of the top 1-3 feet of sediments; (ii) placement of a reactive mat in the area around the Outfall to contain future seeps; (iii) installation of a cap of clean sand over the dredged area; (iv) post-remedy environmental monitoring and reporting requirements; and (v) a commitment by the City to amend the RAP to address appropriate remediation underneath the Pier.

43. The City commenced and completed the dredging project in February 2018. Shortly thereafter, however, Potomac Riverkeeper's members observed significant erosion of the gravel bottom at the point where the Outfall discharges into the River. Over the course of the next several months, Potomac Riverkeeper's members observed a chemical sheen discharging from the Outfall, on the surface of the River near the Outfall, and on the River banks nearby. For example, a Potomac Riverkeeper member's visual inspection of the Outfall on January 24, 2019 revealed iridescent sheens discharging from the pipe and seeping from the bulkhead/embankment surrounding the pipe, and in February 2019, Potomac Riverkeeper observed sheens on top of the water both inside and outside of the floating containment booms surrounding the Outfall.

44. On or about March 19, 2019, Potomac Riverkeeper served the City with a Notice Letter of its intent to bring suit to stop the City's ongoing illegal discharge of coal tar and creosote waste into the River and to stop the City's illegal contribution to an imminent and substantial endangerment to human health and the environment.

45. More than two and a half years after Potomac Riverkeeper's Notice Letter, Potomac Riverkeeper's members have continued to observe discharges of coal tar and creosote waste from the Outfall, as demonstrated by iridescent sheens observed and photographed near the Outfall, including when members visited on March 17, 2021, October 6, 2021, October 26,

2021, January 1, 2022 and February 4, 2022. See Exhibits B-G. Potomac Riverkeeper's members have also recorded video of iridescent sheens floating in the water, covering sediments, and seeping into the River as recently as February 4, 2022. Potomac Riverkeeper's members also have observed more than 40 barrels stored in a fenced-in area at the end of Oronoco Street (see Exhibit H), a number of which contain liquid NAPL that the City removed from the ground that is the source of the iridescent sheens seen in the River.

46. In addition to the evidence of ongoing discharges into the River, sediment samples taken in 2019 from the Outfall area, under the Pier, and to the north of the Pier reconfirmed the existence of tPAH concentrations above the PEC.

47. The containment booms and turbidity curtain against the Pier were battered and damaged by hundreds of logs that rendered them ineffective at containing the sheens (see Exhibit B); and as of September 2021, the turbidity curtain was dislodged and went missing from the site. The City has installed a new turbidity curtain, but as of February 4, 2022, its functionality has also been compromised by debris and logs. See Exhibit I.

48. Samples taken from the Outfall in April 2021 revealed elevated levels of naphthalene and benzene, a carcinogenic volatile organic compound. These naphthalene concentrations were more similar to samples taken from 2016-2018, rather than samples taken from 2019-2020, demonstrating that the City has not resolved what the City referred to as "very minor issues" with respect to continuing discharges of these kinds of materials from the Outfall to the River.

49. Moreover, a report of October 2021 stormwater sampling prepared by the City's environmental consultant found that concentrations of benzo(a)anthracene, a component of NAPL, exceeded Virginia's criterion for "all other surface waters" (see 9 Va. Admin. Code § 25-

260-140, established for all surface waters not designated as a public water supply to protect human health from toxic effects through fish consumption) in samples collected at the Outfall and in the stormwater pipe discharging to the River at the manhole closest to the River.

50. In addition to the ongoing illegal CWA discharges, nearly four years after the August 2017 submission to VDEQ of the revised RAP, in which the City committed to amending the RAP to remediate contaminated sediments under the Pier, the City still has not submitted such an amendment. Nor does the City appear to have any other plan to address the contaminated sediments under the Pier. By August 2018, the Pier owner provided the City with correspondences and permits indicating that it had the necessary state and federal approvals to stabilize the Pier, as well as its own sampling results that confirmed PAH exceedances of the PEC in several areas. Aside from the Pier owner's sampling efforts, sediment samples taken under and to the north of the Pier in 2000, 2016, 2018, and 2019 also confirm PAH concentrations in excess of the PEC. These contaminated sediments under and to the north of the Pier have not been removed and therefore continue to present an imminent and substantial endangerment to human health and the environment.

51. The City is currently in the midst of a Combined Sewer Overflow ("CSO") project that requires the City to remediate the discharge of sewage at all of its combined sewer outfalls and to construct an underground tunnel system to bring combined sewage to the wastewater treatment facility of AlexRenew, the City's sanitation authority. The Pier owner is currently a party to an agreement with AlexRenew that permits AlexRenew to utilize the Robinson Terminal North property as a staging area for the CSO project. This agreement runs through 2024. The Pier owner has advised Potomac Riverkeeper that he will permit the City to remove the Pier and dredge the surrounding area. Doing so now is advisable from both an

environmental and a financial perspective because the City currently has access to the property and will have the necessary hauling equipment on site in connection with the CSO project.

## VIII.   CLAIMS FOR RELIEF

### A. Count 1: CWA Citizen Suit

52. Plaintiff realleges and incorporates herein the foregoing allegations of this Complaint, and further alleges as follows:

53. On or about March 9, 2019, in accordance with the applicable federal statutes and regulations, Potomac Riverkeeper served its Notice of Intent to File Suit under the CWA by registered mail, properly addressed and postage prepaid, to the City as well as the appropriate federal and state officials.  A copy of this Notice Letter is attached hereto as Exhibit A.

54. Section 301(a) of the CWA, 33 U.S.C. §1311(a), prohibits the discharge of pollutants from a point source into navigable waters of the United States, unless pursuant to a NPDES permit issued under Section 402 of the CWA, 33 U.S.C. §1342.

55. The City's ongoing discharge of coal tar and creosote constituents into the Potomac River from the Outfall is a prohibited discharge of pollutants from a point source into navigable waters of the United States under the CWA.  Because the City does not have an individual NPDES permit from VDEQ that authorizes the ongoing discharge of coal tar and creosote wastes, the City is in violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

56. The ongoing discharges of coal tar and creosote constituents into the Potomac River from the Outfall are not authorized by the City's MS4 Permit.  Among the obligations imposed on the City under the MS4 Permit is the duty to detect and eliminate "illicit discharges." This requires the City to prohibit non-stormwater discharges from the storm sewer system that are not otherwise permitted by a separate, individual VPDES permit.  As the ongoing discharge

of coal tar and creosote wastes are "illicit discharges," and not "stormwater" discharges, the continuance of such discharges constitute a violation of the MS4 Permit.

57. The Defendant is subject to injunctive relief under CWA section 505(a), 33 U.S.C. § 1365(a).

58. Pursuant to sections 309(d) and 505(a)(1) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a)(1), Defendant is liable for civil penalties of up to $56,460 per day for each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a) for the discharge of unpermitted pollutants into the Potomac River without an individual NPDES permit from 1975 until the illegal discharge is eliminated.

**B. Count 2: RCRA Citizen Suit**

59. Plaintiff realleges and incorporates herein the foregoing allegations of this Complaint, and further alleges as follows:

60. On or about March 9, 2019, in accordance with the applicable federal statutes and regulations, Potomac Riverkeeper served its Notice of Intent to File Suit under the RCRA by registered mail, properly addressed and postage prepaid, to the City as well as the appropriate federal and state officials.  A copy of this Notice Letter is incorporated by reference and attached hereto as Exhibit A.

61. Coal tar and creosote waste, when discharged to the River and sediments in the River, are solid wastes under RCRA.

62. The City has generated and still is generating coal tar and creosote waste from the MGP area that discharged and is discharging into the River, and is present in River sediments under and to the north of the Pier.

63. The City is a "person" under the RCRA who has contributed to and/or is contributing to the past or present handling, storage, treatment, transportation or disposal of solid waste in the area near the Outfall in and adjacent to the River.

64. An imminent and substantial endangerment to health or the environment may be presented and is in fact presented as a direct and proximate result of the City's contribution to the handling, storage, treatment, transportation or disposal of hazardous waste in the River near the Outfall and the area adjacent to the River near the Outfall.

65. A citizen suit under the RCRA is not precluded by Potomac Riverkeeper's citizen suit in connection with the City's ongoing violation of section 301(a) of the CWA. As described above, the City is in violation of the CWA in connection with its ongoing illegal discharge of coal tar and creosote waste from the Outfall into the River. Additionally, the City is also a "past or present generator . . . who has contributed or who is contributing to the . . . present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment" in violation of the RCRA, 42 U.S.C. § 6972(a)(1)(B). That is, the City has contributed to the disposal of solid waste in the form of coal tar and creosote waste in the River that is present in the sediment under and to the north of the Pier, which presents an imminent and substantial endangerment to health or the environment.

66. Accordingly, Potomac Riverkeeper is entitled to an injunction restraining the City from its pollution-causing conduct, to remediate the sediments under and near the Pier and the lands adjacent to the River near the Outfall, and to take all such other action as may be necessary to abate the imminent and substantial endangerment to health or the environment.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

67. A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the City has violated and continues to violate the CWA and the RCRA;

68. A permanent injunction requiring the City to cease unpermitted CWA discharges into the River;

69. A permanent injunction requiring the City to abate its pollution-causing conduct, to remediate and/or mitigate its pollution in the River sediment near the Outfall, including the area under and to the north of the Pier, as well as the land surrounding the Outfall pipe, and to take all such actions as may be necessary to abate the imminent and substantial endangerment to health and the environment;

70. Civil penalties as provided under Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and its implementing regulations, 40 C.F.R. § 19.4, for violations starting in 1975, including those identified in Plaintiff's Notice Letter, violations identified during discovery, and violations committed subsequent to those identified in this complaint;

71. An injunction authorizing Plaintiff, for the period beginning on the date of the Court's order and running for five years after Defendant achieves compliance with the CWA, to sample or arrange for sampling of any discharge of pollutants from the Outfall, including upstream and downstream sampling, up-gradient and down-gradient sampling, groundwater monitoring that could impact surface water, and sediment sampling, with the costs of the sampling to be borne by the Defendant;

72. An injunction ordering Defendant to provide Plaintiff, for the period beginning on the date of the Court's order and running for five years after Defendant achieves compliance with the CWA, with a copy of all reports and other documents that Defendant submits to EPA, to the Regional Administrator of EPA, or to the Commonwealth of Virginia regarding Defendant's discharges or discharge permit compliance at the time the document is submitted to these authorities;

73. An award to Plaintiff of its costs of litigation, including reasonable attorney and expert witness fees, as provided under Section 505(a) of the CWA, 33 U.S.C. § 1365(d), and section 7002(e) of the RCRA, 42 U.S.C. § 6972(e); and

74. Such other relief as this Court may deem appropriate.

Dated: May 9, 2022.

Respectfully submitted,

/s/ Justin A. Savage

Justin A. Savage (VSB# 41871)
Matthew C. Brewer (*pro hac vice* pending)
Marshall R. Morales (*pro hac vice* pending)
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
jsavage@sidley.com